UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| CHRISTOPHER WHITE, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civ. No. 08-174-B-K |
| ) | |
| MAINE DEPARTMENT OF ) | |
| CORRECTIONS, et al., ) | |
| ) | |
| Defendants ) | |

**MEMORANDUM OF DECISION[1]**
**GRANTING UNOPPOSED MOTION FOR SUMMARY JUDGMENT**

Christopher White commenced this action complaining about his treatment of his diabetes-related health care needs by the defendants during White's incarceration at the Maine Correctional Center and the Maine State Prison. The Maine State Prison was dismissed per an earlier order. (See Doc. Nos. 11 & 19.) The remaining defendant, Correctional Medical Services has filed a motion for summary judgment (Doc. No. 24) to which White has in no way responded. I now grant the motion for summary judgment.

*DISCUSSION*

**A.    Summary Judgment Standard**

" Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant[s are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). I "draw the relevant facts from the summary judgment record and rehearse them in the light most flattering to" White. Bergeron v. Cabral, 560 F.3d 1, 4 (1st Cir. Mar. 9, 2009) (citing Cox v.

---

[1]     Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

Hainey, 391 F.3d 25, 27 (1st Cir.2004 (quoting Federal Rule of Civil Procedure 56(c)).  I draw all reasonable inferences in favor of White, but where he bears the burden of proof, he "'must present definite, competent evidence' from which a reasonable jury could find in [his] favor." United States v. Union Bank For Sav. & Inv. (Jordan), 487 F.3d 8, 17 (1st Cir. 2007) (quoting United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992)).

White has not presented any evidence in defense of the motion for summary judgment. However, this court,

> may not automatically grant a motion for summary judgment simply because the opposing party failed to comply with a local rule requiring a response within a certain number of days. Rather, the court must determine whether summary judgment is "appropriate," which means that it must assure itself that the moving party's submission shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Advisory Committee Note to Rule 56 ("Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.").

NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7 -8 (1st Cir. 2002).

**B.     Facts**

Diabetes mellitus is a chronic disease involving abnormalities in the body's ability to use sugar.  Diabetes is characterized by elevated blood sugars for months to years.  Type 1 diabetes, commonly referred to as insulin-dependent diabetes, is treated with intensive insulin therapy, the purpose of which is to achieve near-normal blood sugars safely, while keeping the episodes of low blood sugars to a minimum.  Because the management of Type 1 diabetes requires close cooperation by a patient who is educated about the disease and considerable flexibility in responding to changes in blood sugar levels, it is a very challenging disease to treat in a prison setting.

### *1. Maine Correctional Center*

Christopher White arrived at the Maine Correctional Center (MCC) on April 20, 2007, with a diagnosis of Type 1 diabetes, and was seen by the MCC nursing staff and a nurse practitioner the same day. The nurse practitioner's initial orders were that (i) White be continued on the same long acting insulin for his diabetes that had been prescribed at the county jail, (ii) his blood glucose was to be checked twice per day, and (iii) he was to receive sliding scale insulin – i.e., regular insulin in varying doses, depending on his blood sugar when he was checked.

On April 21, 2007, when Mr. White was noted to have a high blood sugar, the on-call provider who was contacted by the nursing staff ordered 15 units of regular insulin immediately. However, when Mr. White notified the staff that he was allergic to regular insulin, that order was discontinued. The nurse practitioner then ordered that Mr. White be started on NPH insulin, an insulin with an onset of action starting about 2 hours following injection, a peak effect 4-12 hours after injection, and a duration of action of 18-26 hours. On April 23, 2007, when Mr. White was noted to have a low blood sugar, he was given sugar orally and snacks were ordered at bedtime. White was seen by the nurse practitioner on April 26, 2007, for his intake history and physical, and no significant changes were made to his medical regimen at that time. Mr. White was seen by another nurse practitioner on May 8, 2007, at which time (i) he received counseling for his diabetes, and (ii) his insulin was changed in an attempt to better control his sugar, which had been fluctuating from the 40's to 300's in the morning to >250 in the afternoons.

On May 16, 2007: (i) an order was entered allowing incremental increases in both forms of insulin (increases to occur every three days, but not both on the same day) if Mr. White's blood sugar was above 200, and if he had no hypoglycemic events; and (ii) an order was entered

for sliding scale NovoLog, a human insulin analog with a rapid onset and short duration of action which may be taken 5 to 10 minutes before a meal, rather than the typical 30 minutes required with regular insulin, allowing the patient to adjust his insulin to accommodate variety in eating and activity patterns.

Over the course of the next several days Mr. White's blood sugars ran very high in the afternoons.  On May 21, 2007, Dr. Todd Tritch discussed with Mr. White his commissary purchases since arriving at MCC, which included large amounts of candy bars, frosted animal crackers, and pastries; advised him to stop eating those sugary foods; made some changes to his insulin; and had him scheduled to be seen back in two weeks.  On June 4, 2007, a nurse practitioner increased White's NPH insulin to try to control his sugar, which had been running high in the afternoons.  On June 14, 2007, Mr. White expressed frustration with his diabetes being "out of control," requested an insulin pump, and said he thought he should be released and put under home confinement so he could control his diabetes himself.

An insulin pump allows the patient to control the amount of insulin and the time it is given.  Because any misjudgment or intentional manipulation of the pump can result in severe illness, only patients who demonstrate a thorough understanding of their disease and prove to be cooperative can be trusted with this device.  Before an insulin pump could be considered for Mr. White it was necessary that the following occur: (i) a basal insulin requirement had to be established so that the pump could give a continuous amount of insulin to control the patient's sugar between meals, (ii) the patient had to learn how to count or estimate the amount of carbohydrates he was consuming in order to give himself a bolus amount of insulin at mealtime, and (iii) activity would need to be estimated in relation to its effect on the blood glucose and consideration given at the time of the bolus.  Because of these risks and the complexity of proper

4

insulin control, Dr. Tritch concluded that before he would consider ordering a pump for Mr. White he would have to be confident in White's ability to cooperate with the medical staff.

For a period of time it was difficult to establish Mr. White's insulin needs because of his non-compliance with the dietary regimen.  Despite these difficulties, Dr. Tritch and the other providers at the prison were able to keep Mr. White's blood sugars moderately well controlled by making  frequent adjustments to his insulin and by continuing to meet with him to encourage him and evaluate his condition, and significant progress was made in his care.

When Mr. White was seen on October 31, 2007, in the Chronic Care Clinic improved blood sugar levels were noted, signifying that the patient was compliant with his diet and medication.  On October 31, 2007, Dr. Tritch discussed insulin control with Mr. White, concluded as a result of this discussion that he could safely manage an insulin pump, submitted a consult request to initiate the process of obtaining a pump, and approved his request to have orthotic shoes sent from his home.

On November 1, 2007, a "Diet Order Form" was completed at the direction of Dr. Todd Tritch, authorizing Mr. White to receive diabetic snacks twice per day and stating that he needed to have milk with every meal and with every snack.  The purpose of this order was to make it easier for White to raise his sugars if they were too low.

2.  *Maine State Prison*

Mr. White was transferred from the Maine Correctional Center to the Maine State Prison in November 2007.  Christopher White was first seen by a nurse at MSP on November 14, 2007. Among the services provided to inmates at the Maine State Prison are medical services for chronic conditions including diabetes.  Inmates with certain chronic conditions, including diabetes, are seen in a Chronic Care Clinic at regular intervals.

Since before November of 2007, when Christopher White was transferred to the MSP, CMS has had a plan in place to provide 24-hour emergency medical care to MSP inmates. Since before November of 2007, CMS has had a system in place pursuant to which any inmate in the Maine State Prison could submit a sick call slip which would be triaged by nursing staff, and as a result of this triage process the inmates were either assessed by a registered nurse or, when appropriate, referred to physicians or mid-level providers (nurse practitioners or physician assistants) for further evaluation and care.

By January 16, 2008, Dr. Tritch had discussed Mr. White's case with the diabetic clinic at Eastern Maine Medical Center, and was informed that (contrary to what Mr. White had said) he had not completed the training required to use an insulin pump, and would require classes and frequent visits before a pump would be prescribed for him. Dr. Tritch informed Mr. White of this conclusion, and he also made adjustments to his insulin regimen because White's blood sugars were lower than Dr. Tritch thought they should be. On January 23, 2008, the nursing staff received a handwritten note from Mr. White in which he stated, among other things: "For many months I have had real good blood sugars." In this same note Mr. White complained about Dr. Todd Tritch having recently changed his insulin dose, which he said was causing him to have high blood sugars, especially in the afternoons, and was interfering with his sleep. However, the Vital Sign Flow Sheet for the month of January 2008 reflected little change in Mr. White's blood sugars over the course of that month, and no inordinately high afternoon blood sugars.

On February 5, 2008, Mr. White submitted a sick call slip in which he said he had been having sleep problems and depression as a result of the recent change in insulin, after having had "three good months with [his] insulin." The sleep issues were referred to mental health practitioners at the prison. On February 18, 2008, the nursing staff sent a note to the security

staff, stating that Mr. White should be able to have his blood sugar checked whenever he felt the need.  Dr. Tritch did not tell Mr. White that he was refusing his request for an insulin pump, or otherwise making decisions about his diabetes management, as a result of financial considerations.

      At no time in his care of Christopher White did Dr. Tritch allow economic considerations to influence his medical decision-making.  At various times during Christopher White's incarceration, the management of his diabetes has been complicated by his placement in the Special Management Unit (SMU), because it has been unclear whether he received all the diabetic snacks he was supposed to receive when he was supposed to receive them, and also because inmates in SMU do not have the opportunities for activity (which has an effect on diabetes) that are available to inmates in the general population.

      On January 25, 2008, because Mr. White's blood sugars were running very low, Edie Woodward, PA-C, ordered a decrease in his insulin until his diet was stable and his blood sugars were consistently greater than 60.  On February 20, 2008, after Mr. White's return to general population, Ms. Woodward saw him again and resumed the insulin regimen he had been on before he was transferred to SMU.  On March 11, 2008, Dr. Tritch noted that White had recently had blood sugars that were high in the mornings, and adjusted his insulin accordingly.

      On March 13, 2008, Mr. White was reported to have dangerously high blood sugars, and in response he was given 10 units of NovoLog at his cell.  On March 15, 2008, when it was learned that Mr. White was not eating and was drinking excessive amounts of water, he was placed in SMU where his intake of foods and fluids could be closely monitored.  After Mr. White's transfer from SMU back to the general population, the nursing staff continued to

7

monitor his food and fluid intake and they noted that he occasionally refused to eat meals, which caused him to have low blood sugars.

As of April 11, 2008, Mr. White's blood sugars were generally good, and he was being compliant with recommendations for the management of his disease. On April 11, 2008, Dr. Tritch again ordered special shoes for Mr. White. On April 17, 2008, a new Diet Order Form was completed by a nurse practitioner, Charlene Watkins, prescribing that Mr. White receive three diabetic snacks per day, and milk with each meal and snack. On May 21, 2008, Teresa Kesteloot approved a request by Mr. White for special shoes and insoles.

On June 3, 2008, it was noted in the Chronic Care Clinic that the pulses in both Mr. White's feet were normal, the skin was intact, and his feet were not swollen. On June 12, 2008, Mr. White received a pair of New Balance sneakers, issued for medical reasons. During the months of June through August of 2008, Mr. White was noncompliant with dietary recommendations – for example, not eating meals as scheduled, not eating full meals, not eating snacks at regular intervals throughout the day, and eating multiple snacks at once. The medical and nursing staff responded to these behaviors by asking security staff to carefully monitor Mr. White's food intake, by seeing that his snacks were distributed to him at regular intervals throughout the day, and by making appropriate adjustments to his insulin regimen. On July 13, 2008, Mr. White submitted a request to be seen about his sneakers, which he said had stretched out and were causing him blisters. On July 15, 2008, Mr. White was seen and a new pair of sneakers was ordered for him.

On August 11, 2008, Lorraine Spiller, P.A.-C., an employee of the Maine Department of Corrections, wrote a letter to Mr. White in which she stated that he would not receive an insulin pump unless and until he had been certified in the pump's use, and unless he was compliant with

dietary recommendations. Ms. Spiller further noted that Mr. White was not in fact certified in the use of an insulin pump, and that he had at times been non-compliant with dietary recommendations. Throughout Mr. White's chart are reports of concern regarding Mr. White's "hoarding" of the diabetic snacks he was issued, i.e. saving the snacks and then eating two or more of them together.

On August 21, 2008, Mr. White was notified by nursing staff that his request to have all three of his daily snacks delivered at once was denied. He was informed that instead, in order to help maintain proper blood sugar levels, his snacks would be distributed at intervals throughout the day.

On September 17, 2008, it was noted in the Chronic Care Clinic that the pulses in both Mr. White's feet were normal, the skin was intact, and his feet were not swollen. On October 29, 2008, Kim Robbins, R.N., Health Services Coordinator for the Maine Department of Corrections, responded to a complaint submitted by Mr. White to the Office of Senator Olympia Snowe. Ms. Robbins stated that a review of Mr. White's complete chart showed the following:

> You are enrolled in the Diabetic Chronic Care clinic and have been so since your arrival at the MSP. You have been seen by a medical provider at least every three months and have been seen frequently between these visits, by the MSP nursing staff and other medical providers. You have had lab work drawn nine times since your arrival, with adjustments made to your treatment/therapy. At your most recent diabetic chronic care visit on 9/17/08, it was noted that your sugars were running low in the morning and your night time snack was changed because of this. You have submitted some 45 sick call requests and/or letters that have been addressed by the nursing staff thus far within your time at the MSP. Your diabetic status will continue to be monitored through regularly scheduled chronic care clinic visits and as needed. It appears that you are being provided with appropriate medical care for your condition at the Maine State Prison.

More adjustments were made to Mr. White's insulin regimen in October 2008. No further adjustments were made to his insulin regimen in November 2008. On December 7, 2008,

9

it was noted in the Chronic Care Clinic that Mr. White's blood sugars were currently well controlled, the pulses in both his feet were normal, the skin was intact, and his feet were not swollen.

For the past several months Mr. White's blood sugars have remained relatively well-controlled. On March 12, 2009, a nurse practitioner who saw White in the clinic noted some evidence of venous stasis in his legs bilaterally and ordered insoles for his sneakers. Since receiving sneakers in March, White has complained that the insoles he received are not satisfactory, and new "cushioned" insoles have been ordered for him. Mr. White is currently walking three miles per day.

According to the Tritch affidavit, Tritch has never deliberately disregarded a risk of serious harm to Christopher White, but rather has been responsive and attentive to Mr. White's medical needs, and has at all times exercised his best professional judgment in Mr. White's treatment and care. No other health care professional working in the Maine Correctional Center or the Maine State Prison has disregarded a risk of harm to Christopher White; rather, they have been responsive and attentive to Mr. White's medical needs. The care provided for Mr. White's diabetes since he has been incarcerated has been reasonable, appropriate, and within the standard of professional medical care. Christopher White has suffered none of the serious, long-term effects of diabetes during his incarceration. There is no evidence that White has experienced, or is immediately threatened with, vision loss, nerve damage, heart or kidney damage, or any of the other severe problems frequently associated with diabetes. According to the Kesteloot affidavit, it has never been the policy of CMS to deny or limit the delivery of medically necessary health care services to inmates. To the contrary, CMS policy states that access to care to meet serious health needs is the fundamental principle upon which all health service policies are based.

With few exceptions, Mr. White's blood glucose levels have been checked and recorded daily by nursing staff since November 16, 2007.  On most days they have been checked and recorded multiple (3 to 4) times daily.  Throughout his incarceration, Christopher White has been seen in the Clinic approximately every 90 days.  Mr. White has also been seen by medical and/or nursing staff for attention to specific complaints pertaining to his diabetes (i.e., in addition to the Chronic Care Clinic and the regular monitoring of blood glucose levels) on dozens of occasions.  Medical and nursing staff have regularly counseled Mr. White regarding his diet, particularly the importance of eating regular, full meals.  At various times, when he has been in the Special Management Unit, Mr. White's food intake has been monitored and recorded.

Mr. White has often been non-compliant with the dietary recommendations of medical and nursing staff, frequently skipping meals, waiting to eat until he felt it was convenient to do so, or eating less than full meals, and these behaviors have often been associated with episodes of hypoglycemia (low blood sugar).

### C.   These Facts in View of the Eighth Amendment Deliberate Indifference Standard

With respect to the Eighth Amendment deliberate indifference standard in the context of medical care for inmates, the First Circuit summarized in Ruiz-Rosa v. Rullan:

> For medical treatment in prison to offend the Constitution, the care "must involve 'acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.' " Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 161 (1st Cir.2006) (quoting Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)). Deliberate indifference in this context may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with "actual knowledge of impending harm, easily preventable." Id. at 162 (internal quotation marks omitted). Deliberate indifference means that "a prison official subjectively 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " Burrell [v. Hampshire County], 307 F.3d [1,] 8 [(1st Cir. 2002)](quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). Therefore, substandard care, malpractice,

11

>negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation. Feeney, 464 F.3d at 161-62.

485 F.3d 150, 156 (1st Cir. 2007).

"'Deliberate indifference' thus defines a narrow band of conduct in this setting." Feeney 464 F.3d at 162. "The care provided must have been '"so inadequate as to shock the conscience." '" Id. (quoting Torraco v. Maloney, 923 F.2d 231, 235 (1st Cir.1991), in turn quoting Sires v. Berman, 834 F.2d 9, 13 (1st Cir.1987)).

The defendant's unopposed facts tell a story of an ongoing disagreement about the appropriate course of treatment between White and CMS personnel. However, disagreements between an inmate and a medical care provider does not a constitutional violation make. See Ruiz-Rosa, 485 F.3d at 156. There is no basis in this record to draw an inference that any of the CMS staff addressing White's health care needs denied him medical care as a form of punishment or that they made decisions about White's medical care recklessly with "actual knowledge of impending harm, easily preventable." Feeney, 464 F.3d at 162. Even if the court were to conclude from the ups and downs in White's medical health stemming from his insulin levels that there was some basis to infer negligence under the standard recited above, that is simply not be enough to justify sending this case to trial on an Eighth Amendment theory.

In his last communication with the Court – filed before the motion for summary judgment[2] – White describes his complaint as based on his being taken off his medications when he was taken into the state system and describes his continuing back and forth with Dr. Tritch in the months that followed with respect to getting the right medication, an insulin pump, and

---

[2] Because this is filed before the motion for summary judgment was even filed it really cannot be treated as if it is somehow responsive to the facts and arguments made in the motion for summary judgment.

12

receiving the proper footwear.  (See Doc. No. 23 at 1-3.)[3]  He indicates that his feet are purple and numb.  (Id. at 2.)  In this letter he represents that he has been in better control of his diabetes (id. at 2-3), that all in all his health is good (although not because of the help of the medical department)(id. at 2), and that "[t]hings have improved and with luck they will continue to" (id. at 3).  It may well be that White has purposefully decided not to respond to this motion for summary judgment because of the improvements in his situation.   He has not filed a motion to extend time to file a response although he has demonstrated that he believes he can address his case concerns with the Court (see Doc. Nos. 12, 15, 20, 22, 23).  The time for letting me know of his current position and any evidence that disputes the defendant's statement of fact has now passed.  I must decide the motion for summary judgment based on the undisputed record now before me.

### *Conclusion*

Based on the undisputed material facts and for the reasons set forth above, I grant Correctional Medical Service's motion for summary judgment.

*So Ordered.*

June 4, 2009                                                    /s/ Margaret J. Kravchuk
                                                                U.S. Magistrate Judge

---

[3] He relates that he has been trying to get the prison to provide sugar free snacks and has hopes of resolving this issue.  (Id. at 2-3.)  This claim does not raise a liability issue vis-à-vis CMS.